UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RICHARD ARROYO-RODRIGUEZ,

      Plaintiff,

v.                                  Case No:  6:11-cv-1518-Orl-28TBS

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

_____

## REPORT AND RECOMMENDATION[1]

The Plaintiff brings this action pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") under the Act.

I have reviewed the record, including the relevant administrative law judge's decision, the exhibits, the administrative record, and the pleadings and memoranda submitted by the parties.  For the reasons that follow, I respectfully recommend that the Commissioner's final decision in this case be **affirmed**, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  Background

### A.  Procedural History

Plaintiff filed for DIB benefits on August 17, 2000[2].  (Tr. 55-58, 852).  He claims disability beginning on June 15, 1997 due to asthma, Hepatitis B and C, and drug

---

[1] Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. FLA. R. 6.02, within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

addiction. (Id.). Plaintiff subsequently added disability due to depression. (Tr. 63, 852).  He

has amended his alleged onset of disability to June 2, 2002; thus his date last insured for

purposes of a period of disability and DIB is June 30, 2002. (Tr. 852-53, 1085).  Plaintiff

was 46 years old on his date last insured.  (Tr. 861).  He has a high school diploma and

completed a year and a half of college courses. (Tr. 830, 1073).

On June 2, 2002, Plaintiff's two sons, ages 24 and 26, were murdered during a

carjacking. (Tr. 836, 1078). He has one remaining child under the age of twenty-one: an

11-year old daughter who lives with her mother in Deltona, Florida. (Tr. 829-30).  Plaintiff

stopped drinking and abusing drugs in 2003. (Tr. 833).

His application was denied initially and on reconsideration.  (Tr. 471, 474).  On April

11, 2003, at Plaintiff's request, a hearing was held before Administrative Law Judge Henry

U. Snavely ("ALJ Snavely").  (Tr. 474-481).  ALJ Snavely  found that Plaintiff retained the

residual functional capacity to perform a reduced range of sedentary work, including his

past relevant work as a telemarketer, and therefore, he was not disabled. (Tr. 478-79).  By

Order dated November 2, 2004, the Appeals Council remanded the case based upon  ALJ

Snavely's failure to have incorporate Plaintiff's severe mental impairment into his residual

functional capacity finding. (Tr. 492-94).

A second hearing was held on April 25, 2006 before Administrative Law Judge

Robert Droker ("ALJ Droker"), at which Plaintiff testified and was represented by his current

counsel of record. (Tr. 826-847). By written decision dated May 25, 2006, ALJ Droker

found that, prior to the expiration of his insured period on June 30, 2002, Plaintiff retained

the residual functional capacity to perform a reduced range of exertionally light work,

---

[2] Plaintiff alleges that his application for DIB was filed on October 2, 2000 (Doc. 19 at 1), however,  August 17, 2000 is the date stamped on each page of Plaintiff's application (Tr. 55-58) and is the date used by the ALJ (Tr. 852).

including his past relevant work as a telemarketer or, alternatively, four identified alternative jobs, and was therefore not disabled. (Tr. 18-26).

After the Appeals Council refused to set aside this unfavorable decision (Tr. 7-10), Plaintiff brought a civil action in this court (Case No. 6:07-cv-2033-Orl-MSS-GJK). On October 24, 2008, on motion of the Commissioner, the Court reversed the unfavorable decision and remanded the case for further administrative proceedings. (Case No. 6:07-cv-2033-Orl-MSS-GJK, Doc. 21). On December 8, 2008, the Appeals Council ordered that, on remand, a new administrative law judge fully consider all the record evidence pertaining to the insured period, obtain medical expert and vocational expert testimony, and fully evaluate Plaintiff's mental impairment in accordance with the regulations. (Tr. 888-890).

A third hearing was held on August 15, 2009 before Administrative Law Judge William Greer ("ALJ Greer"). (Tr. 1070-81). The hearing was continued due to ALJ Greer's failure to obtain a medical expert as directed by the remand Order. (Tr. 1079-80). A fourth hearing was held before ALJ Greer on September 16, 2009, at which time vocational and medical experts testified. (Tr. 1082-1148). Then, counsel requested a supplemental hearing, due to objections to the basis of the testimony of both experts. (Tr. 932-33).

A fifth hearing was held on April 5, 2010 before Administrative Law Judge Aaron Morgan ("the ALJ"), at which time a different vocational expert testified. (Tr. 1149-1182). By written decision dated July 16, 2010, the ALJ found that, were Plaintiff to stop his substance abuse, his depression and hepatitis C would have permitted the performance of a reduced range of simple, repetitive light work, including several alternative jobs, and therefore, Plaintiff is not disabled. (Tr. 869-82). Plaintiff requested that the Appeals Council review this latest unfavorable decision, and the Council assumed jurisdiction over the case pursuant to 20 C.F.R. 404.984(b)(3). (Tr. 852-65). By Notice and Decision of the

Appeals Council dated August 13, 2011, it affirmed the unfavorable decision of the ALJ.

(Tr. 852-62), making the Council's decision the final decision of the Commissioner.

Plaintiff timely filed this action for judicial review on September 14, 2011.  (Doc. 1).  He has

exhausted his available administrative remedies and this case is properly before this Court.

On appeal, Plaintiff argues that the ALJ (1) failed to properly credit the testimony of his

treating psychiatrist, Dr. Lopez and examining psychiatrists Dr. Figueroa and Dr. R.

Martinez; (2) relied upon medical advisor testimony that was unsupported by the record;

and (3) relied upon flawed vocational expert testimony in reaching his decision.  (Doc. 19

at 20-30).

1.   Medical Expert Testimony – Dr. Neil Lewis, Ph.D.

At the fourth hearing, the government called Dr. Lewis to testify via telephone as

medical expert pursuant to the terms of the remand Order. (Tr. 1099-1124). Dr. Lewis

testified that the only medical evidence of record that "pointed at" the period prior to the

expiration of Plaintiff's insured status was a treatment note dated August 23, 2002, which

reflected a working diagnosis of depression but that it was "inconclusive" in that the note

does not reflect "any particular symptoms commonly associated with depression." (Tr.

1100).  Dr. Lewis concluded that Plaintiff's condition subsequently "took a decided turn for

the worse" but that his deterioration was occasioned "by substance abuse." (Tr. 1100-01).[3]

Dr. Lewis reviewed Dr. Figueroa's treatment notes from his one and only

examination of Plaintiff[4] and concluded that the GAF score of 49 which Dr. Figueroa

_____

[3] Dr. Lewis testified that he based his conclusion in part, on treatment notes from October and November of 2002, in which Plaintiff was diagnosed with substance induced mood disorder based on alcohol and cocaine dependence with depression. (Tr. 1101). Dr. Lewis testified that considering Plaintiff's substance abuse, he would not have been capable of performing basic work functions and would have met the criteria of the Listings under sections 12.04 and 12.09, but if he had quit abusing substances, he would have had the capacity for simple, unskilled work. (Tr. 1102-04). Dr. Lewis conceded that he had not treated patients who had lost a family member. (Tr. 1106).

[4] Dr. Figueroa examined Plaintiff once, on March 29, 2004.  (Tr. 537-47).

assigned Plaintiff was only based on Plaintiff's reported symptoms and was not supported by the doctor's examination findings or observations. (Tr. 1108-1110). Dr. Lewis commented that Dr. Figueroa's findings reveal Plaintiff was operating "essentially within the normal range" and that those types of findings are "contrary to the severe global assessment of functioning that he reported." (Tr. 1110). Dr. Lewis noted that Plaintiff aggravated his back a few months after June 2002 and concluded that although Dr. Figueroa's Axis III diagnosis of severe back pain could contribute to the GAF score, it was not relevant to the severity of depression Plaintiff may have experienced in June 2002. (Tr. 1111-1112).

Dr. Lewis also reviewed examining psychiatrist Ramon Martinez' treatment notes from his one and only examination[5] of Plaintiff. He concluded that Dr. Martinez reached his diagnosis of Major Depressive Disorder with a GAF of 50 on the basis of a combination of Plaintiff's reported history, reported symptoms, and the doctor's own observations and inferences on examination, which, he noted, is how psychiatrists normally arrive at their opinions. (Tr. 1117-18). Dr. Lewis testified that other than a constricted affect and feelings of hopelessness, Dr. Martinez' mental status examination was largely within the normal range. (Tr. 1118).

Dr. Lewis also examined the medical opinions of treating psychiatrist, Dr. Lopez. He concluded that Dr. Lopez' diagnosis of Major Depressive Disorder with a GAF of 50 was "unduly severe given the objective medical evidence that's in the record." (Tr. 1120). Dr. Lewis opined that there was nothing in the record to indicate that Dr. Lopez, who treated Plaintiff in September of 2006 and most recently in March of 2009, related his findings back to June of 2002. (Tr. 1122). Dr. Lewis also testified that Dr. Martinez, who did relate his opinion back to 2000, appeared to have based his opinion on Mr. Arroyo's

---

[5] Dr. R. Martinez examined Plaintiff once, on April 4, 2006. (Tr. 727-736).

reports and statements as opposed to a review of records from 2000, and Dr. Martinez did not address the issue of whether Plaintiff's disability from 2000 was related to drug abuse or failure to comply with treatment for depression. (Tr. 1122-23).

       2.   Vocational Expert Testimony - Mr. Mark Capps and Ms. Donna Mancini

At the fourth hearing, the government called Mr. Mark Capps to testify as a vocational expert ("VE Capps") pursuant to the remand Order. (Tr. 1124-1147).  VE Capps testified that Plaintiff's past relevant work was semi-skilled or skilled in nature, such that a limitation to simple work would preclude all his past relevant work. (Tr. 1125). VE Capps concluded that an individual limited to light work, further reduced by no more than occasional postural activities, no work around heights, no excessive exposure to airborne irritants, and no more than simple, repetitive tasks could perform the alternative jobs of warehouse checker[6] under Dictionary of Occupational Titles ("DOT") code 222.687.010, with 700 such jobs available regionally and 13,000 nationally; small products assembler under DOT code 706.684-022, with 3,200 positions regionally and 111,000 nationally; and mail sorter under DOT code 209.687-026, with 1,100 positions regionally and 26,000 nationally. (Tr. 1126-27).

VE Capps revealed that these numbers were based on a publication of the U.S. Department of Labor, Bureau of Labor Statistics. (Tr. 1127). When asked if the numbers represent the numbers of the specific positions identified or whether they are merely the number of jobs listed under a general job category, VE Capps testified that "there's no way to tell how exactly how many these numbers clearly show with - exactly is the good word to

---

      [6] VE Capps conceded that the warehouse checker would be exposed to toxic and caustic conditions occasionally. (Tr. 1135). He clarified that he had seen the job of warehouse checker performed once, between 2000 and 2003, but had never studied the job, and that he would have the "same answers on … each job" previously identified. (Tr. 1137). He had placed people in warehouse jobs but not in mail sorter jobs or in small parts assembly jobs exactly as that title would imply. (Tr. 1138). He testified that missing two or more workdays a month would lead to termination. (Tr. 1144).

use - how many of these jobs are in the state of Florida, or how many are in the economy. I would say that they exist in significant numbers." (Tr. 1128). He clarified that the Bureau of Labor Statistics is the source of the information but that it is he who reduces those numbers. (Tr. 1129).[7]

At the fifth hearing, Ms. Donna Mancini ("VE Mancini") provided additional vocational expert testimony. (Tr. 1159-1176).  She testified that she would defer to a determination of the Florida Department of Vocational Rehabilitation if that agency believed someone was too disabled to return to any work and would not be a candidate for employment, because the agency would have reviewed the medical records and performed specific employment-related testing. (Tr. 1159-60). She said someone with the marked mental function limitations endorsed by Dr. Figueroa would not be able to perform any work existing in significant numbers in the national economy. (Tr. 1170-71).

It was VE Mancini's opinion that someone who would miss more than three workdays per month as endorsed by Dr. Lopez would likewise not be able to sustain any work. (Tr. 1171).  She testified that someone with the moderate mental limitations assessed by Dr. Lopez would still be able to perform Mr. Arroyo's past relevant work as a home health aide and telemarketer, as those are low semi-skilled and semi-skilled positions that do not involve supervision or computer knowledge, but if those limitations required that he "had to be corrected on a regular basis, or directed on a regular basis, that could interfere with his retention of the job." (Tr. 1174-75).

B.  Relevant Medical Records

---

[7] In a letter to ALJ Greer and to counsel dated October 13, 2009, VE Capps explained the basis of the employment statistics he provided at the hearing. (Tr. 980-82). He then quoted at length from an unidentified "software program that [he] use[s] to assist [his] analysis of employment estimates." (Tr. 980-81). The statement from the computer program claims that it utilizes a new, peer-reviewed method for estimating the numbers of people employed at the DOT level using available government data from the U.S. Department of Labor Bureau of Labor Statistics, citing two pages from the Bureau of Labor Statistics website. (Id.).

1.   Pulmonary Function Test - State Agency Consultative Examination

On November 14, 2000, Plaintiff was seen by the state agency for pulmonary

function testing in connection with his disability claim.  (Tr. 119). Testing revealed mildly

reduced FEV1 and moderately reduced FEV1/FVC, consistent with airway obstruction.

(Id.). The record showed a very good response to nebulized bronchodilators. (Id.).

2.   Dr. Luis Carlos Rojas Ruiz - State Agency Consultative Psychiatrist

On January 22, 2001, the state agency sent Plaintiff for psychiatric evaluation by Dr.

Rojas. (Tr. 120-126). Plaintiff reported symptoms of anxiety, insomnia, isolation, irritability,

and restlessness. (Tr. 120). Plaintiff reported that at the time, he was under psychiatric

treatment with a Dr. Medina at the VA (where he began going in 2000), who had been

prescribing Desyrel at100 milligrams a day. (Id.). Plaintiff reported having had "several"

psychiatric hospitalizations at the VA and that he had tried to commit suicide by overdosing

on heroin. (Tr. 120-21). Mental status examination revealed some nervousness on

occasion; feelings of anxiousness, nervousness, and worry; a depressed and anxious

mood; recall of four out of six digits forward and backward; and lack of understanding of

what to do if a stamped, addressed letter were found on the ground. (Tr. 122).

Mental status examination revealed that Plaintiff was "calm, spontaneous, affable,

cooperative, reflective, with no signs of walking difficulty;" appropriate and clean clothing;

evidence of good oral hygiene; well-kept appearance; appropriate visual contact; no

problems with thought process and content; fluid organization of thoughts and ideas;

logical and coherent; no auditory hallucinations; oriented as to persons, time and place;

memory in-tact with immediate recall.  (Tr. 121-122).  Dr. Rojas diagnosed a slight

dysthymic disorder, intravenous heroin addiction, cocaine abuse, and a history of hepatitis

C and asthma, and assessed his GAF at 80.[8] (Tr. 122).

---

[8] The Global Assessment of Functioning or "GAF" scale reflects a clinician's

### 3.  Dr. David E. Martinez - State Agency Consultative Internist

On February 5, 2001, the state agency sent Plaintiff for an internal medicine evaluation by Dr. David E. Martinez Melendez. (Tr. 127-129). Plaintiff reported a history of asthma since 1974, hepatitis B and C since 1997-98, depression and anxiety with several suicide attempts, a seven-year history of intravenous drug use (last use three months prior) and 15-year abuse of alcohol (with continued drinking on weekends). (Tr. 127). Physical examination revealed no abnormalities. (Tr. 128). X-rays revealed hyperinflated lungs, suspicious for emphysematous changes. (Tr. 129). Dr. Martinez diagnosed history of hepatitis B and C, bronchial asthma, a nervous disorder, and alcoholism. (Id.). He assessed no limitations on his ability to speak, hear, sit, stand, walk, travel, handle objects, lift, or carry. (Id.).

### 4.  VA Disability Determination

In a decision dated May 24, 2001, the VA determined that Plaintiff's asthma and hepatitis "precluded [him] from obtaining and retaining employment by reason of his overall disability picture" and that "extraschedular permanent and total disability rating is authorized." (Tr. 141-42). The decision was affirmed on November 18, 2002. (Tr. 244-46).

### 5.  Florida Department of Education - Vocational Rehabilitation Denial

On August 3, 2002, the Division of Vocational Rehabilitation, a division of the Florida Department of Education, denied Plaintiff's request for vocational rehabilitation services. (Tr. 986-87).  After reviewing and discussing Plaintiff's medical records and evaluation reports, the Division determined that Plaintiff was "not eligible for vocational

---

assessment of the individual's overall level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed.1994) ("DSM-IV"). A GAF of 71-80 indicates that symptoms, if any, are transient and expected reactions to psycho-social stressors. Such a rating indicates no more than a slight impairment in social, occupational, or school functioning. DSM-IV at 34.

rehabilitation services because [his] disability is too severe at this time for rehabilitations services to result in an employment outcome." (Tr. 986).

6.   VA Medical Center Physical and Mental Health Treatment

Plaintiff presented to the VA Medical Center at San Juan, Puerto Rico in September of 1997 and again in April and May of 1998 and August and September of 1999 with exacerbations of his bronchial asthma, for which his inhaler was refilled. (Tr. 188, 184-188, 277, 279-282). A chest x-ray dated January 6, 1998 revealed signs of chronic obstructive pulmonary disease (COPD) changes. (Tr. 211-12). Plaintiff was diagnosed with hepatitis C in October 22, 1999, and blood tests dated August 19, 1999 confirmed the presence of hepatitis C antibodies. (Tr. 181, 170). He had further asthma exacerbations on May 2, August 8, and October 9, 2000. (Tr. 170-172, 178). On August 9, 2000, he was admitted to the VAMC for five days, during which he was given prednisone, due to the severity of his asthma exacerbation. (Tr. 164-169). Another chest x-ray dated August 9, 2000 revealed an emphysematous configuration of the chest. (Tr. 205). Another x-ray dated September 26, 2000 again revealed hyperinflated lungs. (Tr. 201). An abdominal sonogram dated December 5, 2000 revealed no liver abnormalities. (Tr. 197).

On January 3, 2001, Plaintiff presented to the VAMC feeling suicidal and "asking for help." (Tr. 157). On January 9, 2001, he presented to the VAMC, but advised that he had "no suicidal or homicidal ideas."  (Tr. 154).  The observing physician noted that his affect was broad and his mood anxious.  (Id.).  He was diagnosed with anxiety.  (Id.).  On January 3 and January 9 he was referred for group therapy.  (Tr. 154, 157).  On February 19, 2001, Plaintiff was said to be complying with his twice weekly treatment and that his state of mind had been improving. (Tr. 152-53). On April 2, 2001, he was prescribed Xanax and was taken off Trazadone and his antidepressant, Citalopram. (Tr. 151). On July 3, 2001, he presented to the VAMC to change his primary care provider from the San Juan

VA to Florida, but reported that he was feeling fine and that his asthma was stable on daily medication. (Tr. 247). Plaintiff continued to experience chronic body pains, but was only taking pain medication occasionally "due to his liver problem." (Id.). He continued to participate in the VA's Wellness Program, which had improved his physical and mental status. (Tr. 253).

On August 18, 2002, Plaintiff presented to the ER with abdominal pain and vomiting. (Tr. 228-230). Abdominal x-rays were normal. (Tr. 230). He was diagnosed with nausea and vomiting, noninfectious gastroenteritis, malaise and fatigue, upper quadrant pain, and chronic hepatitis C and asthma. (Tr. 234). On August 23, 2002, he presented to the infectious diseases clinic for monitoring of his hepatitis C infection, at which time it was noted that just two months earlier, his two sons were shot and killed and he was "having problems dealing with" the tragedy. (Tr. 445). Physical examination yielded no abnormal findings, but Plaintiff was diagnosed with "depression reactive to recent tragic loss of 2 sons." (Tr. 446). He was started on the antidepressant Celexa, 20 mg every morning. (Tr. 446). On October 11, 2002, his urine tested positive for benzodiazepines and cannabinoids but negative for opiates, amphetamines, cocaine, and alcohol. (Tr. 456).

On October 23, 2002, Plaintiff was admitted to the VAMC with depressive symptoms since his sons were killed in a group altercation/shoot-out four months before. (Tr. 431-32). He admitted to being a chronic alcohol, cocaine, and marijuana user and that he had been drinking heavily the morning of his examination. (Tr. 431). Mental status examination revealed minimal eye contact, marked psychomotor retardation, suicidal ideation with no present plan, a significantly depressed mood, a constricted affect, poor judgment, fair insight, and a decreased appetite since the death of his sons, including inducing vomiting after eating. (Tr. 431, 433). He had also been drinking up to a liter of vodka a day since the death of his children. (Tr. 432). Plaintiff was diagnosed with Depressive Disorder; rule out

substance-induced mood disorder; alcohol, cannabis, cocaine, and nicotine dependence with physiological dependence; and opiate dependence in sustained full remission. (Tr. 435). His GAF was assessed at 39.[9] (Tr. 436).

For the first five days of Plaintiff's hospital admission, his behavior ranged from being calm and cooperative and interacting with is peers (Tr. 395-96), to being quiet, refusing to socialize or comply with his treatment regimen (Tr. 399). On October 27, however, he began to complain of severe anxiety and was tearful. (Tr. 392). He was given Vistaril which helped him relax. (Tr. 392). On October 28, while in the hospital, he was found on the floor experiencing a seizure. (Tr. 239, 384). After being stabilized, he reported pain in his head and back. (Tr. 384). X-rays of the lumbosacral spine showed evidence of a recent compression fracture of L1, with mild disc disease from L4 through S1. (Tr. 238). He was placed on Flexeril for the pain and spasms in his back. (Tr. 376). On October 28, his mood was mildly depressed with a congruent affect, though he showed no evidence of hallucinations, delusions, mania, or psychosis. (Tr. 371-72).

On October 29, 2002, his affect was normal and his mood congruent. (Tr. 378). The same diagnoses were affirmed, but it was noted that his diagnosis was complicated by his bereavement over the death of his sons as well as his recent abuse of alcohol, cocaine, and benzodiazepines. (Tr. 379). On discharge on October 31, 2002, his affect was normal and his mood congruent. (Tr. 360). He was diagnosed with substance-induced mood disorder with depressive features; alcohol, cocaine, cannabinoid, and nicotine dependence with physiological dependence; and opioid dependence in full, sustained remission. (Tr. 355). His GAF was assessed at 50.[10] (Id.). Plaintiff was given no medication on discharge

---

[9] A GAF of 31 to 40 suggests "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work)." DSM-IV, 34.

[10] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe

and was directed to dispose of any Xanax or Celexa that he may have had at home. (Tr. 360).

On follow up with the mental health clinic on November 5, 2002, he reported feeling "so much better," having abstained from drugs and alcohol and attending 12-step meetings. (Tr. 335-339). His substance-induced mood disorder was found to be "resolving," and his GAF was assessed at 55.[11] (Tr. 339). On November 26, 2002, it was noted that his breath smelled of alcohol and he requested refills of Xanax to help him sleep. (Tr. 330). He admitted he could not discuss the death of his sons and that he avoided the subject. (Id.). He was intermittently tearful but his affect was full with no evidence of psychosis. (Id.). On December 17, 2002, he admitted to continued drinking in order "to forget." (Tr. 321).  Plaintiff continued to have depressive thoughts regarding the death of his sons but refused referrals for adjunct therapy to help with those feelings. (Id.). On February 11, 2003, his drug screen was positive for cannabinoids but negative for opiates, benzodiazepines, amphetamines, cocaine, and alcohol. (Tr. 453).

Plaintiff reported that as of September 7, 2003, he had been free of all illegal drugs and alcohol. (Tr. 633). On October 30, 2003, he was seen as friendly and cooperative, with an appropriate mood and affect and intact memory and judgment. (Tr. 634). As of January 20, 2004, he was still free of all substance abuse and was attending 12-step meetings. (Tr. 607-08).

On May 1, 2004, Plaintiff had another asthma attack, for which he was placed on a tapering dose of prednisone in addition to his continued use of nebulized inhalers. (Tr. 598). On November 23, 2004, he complained of severe fatigue and drowsiness. (Tr. 584-

---

obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[11] A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV, 34.

87). Tests again showed an enlarged liver with fatty infiltrations, and his thyroid function was "significantly" low. (Tr. 587). The doctor determined that his depression would have to be stabilized before undergoing any treatment for his liver condition due to its "significant neuropsychiatric side effects." (Tr. 588).

At his January 5, 2005 session with psychologist Robert O. DeCastro, Plaintiff reported feeling "alright" but admitted to still crying over the loss of his sons. (Tr. 579). Mental status examination revealed no abnormalities. (Tr. 580). He was diagnosed with an Adjustment Disorder, not otherwise specified, with a GAF of 60. (Tr. 580-81). On January 26, 2005, he was still feeling fatigued and depressed. (Tr. 581-82). He refused treatment for his hepatitis C because he had "not yet gotten over the [symptoms] of his depression." (Tr. 582).

On October 13, 2005, Plaintiff reported to Dr. Raymond Dupre that after having talked about the death of his two sons during another psychological evaluation, he became even more depressed and might want to resume antidepressant medication. (Tr. 707). Dr. Dupre diagnosed him with Major Depressive Disorder on January 17, 2006. (Tr. 697-98).

On July 24, 2007 follow-up with Dr. Dupre, Plaintiff reported back pain of a seven on a zero-to-ten scale. (Tr. 1014). He also reported feeling "lousy and dangerous," that he was "not thinking straight," and was feeling "drained." (Id.). His asthma and hepatitis C were "getting him down." (Id.). He was also "missing his two sons who were killed almost five years" prior. (Id.). He was still abstaining from all drugs and alcohol. (Id.). He was feeling the need for pain medication but was fearful of abusing or becoming addicted to it. (Tr. 1014-15). He had contemplated overdosing but stated that it "wouldn't work" as he'd "tried it before." (Tr. 1015). He agreed to present to an ER if his suicidal thoughts became uncontrollable. (Id.). Mental status exam revealed a disheveled appearance with body

odor; an oppositional, resistant, defensive and evasive attitude; a depressed, angry, and irritable mood; suicidal ideation; a flat affect; and poor insight and judgment. (Tr. 1015-16).

On August 2, 2007, Plaintiff followed up with psychiatrist Virgilio Lopez for medication management and monitoring of his depression and substance dependence. (Tr. 1009). He reported chronic back pain, asthma, and a "traumatic incident" five years prior. (Id.). Examination showed that he was walking with a cane with an appropriate mood that was more anxious than depressed, and pessimistic thinking. (Tr. 1009). Dr. Lopez diagnosed Major Depressive Disorder, recurrent, moderate, with a GAF of 50. (Tr. 1010). He continued his prescriptions for Celexa and Buspar. (Tr. 1010).

On September 10, 2007, Plaintiff was evaluated by Dr. Jean Hemingway, another staff psychiatrist at the VA. (Tr. 1008). He reported an improved mood on Buspar but said "many things" were "overwhelming" him and that he had finally arrived at a stage of grieving. (Id.). He was feeling guilty about the fact that he was using drugs at the time of the murder of his two sons. (Id.). Examination revealed a neutral mood, fair insight, and adequate concentration. (Id.). Dr. Hemingway affirmed the diagnosis of Depressive Disorder and Polysubstance abuse in sustained remission with a GAF of 55. (Id.).

Plaintiff returned to Dr. Lopez on June 26, 2008 for continued medication management. (Tr. 1039). He reported feeling "better" and "comfortable with himself" in that his medications "help him relax a bit more." (Id.). Mental status examination was unremarkable, and the diagnosis of Major Depressive Disorder was affirmed, with his GAF assessed at 55. (Tr. 1040). Celexa was continued, and Buspar was increased. (Id.). He was still abstaining from alcohol use. (Id.).

On January 5, 2009 follow up with Dr. Lopez, Plaintiff reported having been avoiding others and preferring to be alone, missing "relatives who passed away" but not feeling comfortable discussing his feelings about his deceased relatives. (Tr. 1024). He was still

feeling anxious. (Id.). Exam revealed a mildly depressed mood. (Id.). Dr. Lopez affirmed

the diagnosis of Major Depressive Disorder and a GAF of 55. (Tr. 1024-25).

On March 6, 2009, Dr. Lopez completed a Psychiatric/Psychological Impairment

Questionnaire on the basis of his treatment of Plaintiff (every two months since September

of 2006). (Tr. 1042-49). He affirmed the diagnosis of Major Depressive Disorder, recurrent,

moderate, with a GAF of 50 both presently and in the preceding year. (Tr. 1042). Clinical

findings in support of the diagnosis consisted of appetite disturbance with weight change,

sleep disturbance, mood disturbance, anhedonia, difficulty concentrating, and decreased

energy. (Tr. 1043). His primary symptoms consisted of a depressed mood, poor

concentration, insomnia, poor appetite, and feelings of hopelessness. (Tr. 1044). Dr. Lopez

found Plaintiff to be "moderately limited" in 17 of 20 listed areas of mental function

attendant to the performance of substantial gainful activity. (Tr. 1045-47). He added that he

"still has depressive symptoms and [is] also actively grieving [the] loss of loved ones." (Tr.

1047). Dr. Lopez estimated Plaintiff would miss work more than three times a month due to

his impairments. (Tr. 1049). Asked of the earliest date that his description of Plaintiff's

limitations would apply, Dr. Lopez replied, "12 mo[nth]s." (Id.).

On May 29, 2009 follow-up with Dr. Lopez, Plaintiff was still reluctant to discuss the

upcoming seventh anniversary of the traumatic deaths of his two sons. (Tr. 1050). His

mood was mildly depressed, with his thought content focused on "getting over the death of

his 2 adult sons 7 years ago." (Id.). He was willing to continue with therapy and

medications as prescribed. (Id.). Dr. Lopez affirmed the diagnosis of Major Depressive

Disorder, recurrent, moderate, with a GAF of 55. (Id.).

7.   Dr. Figueroa - Independent Examining Psychiatrist

On March 29, 2004, Plaintiff underwent a one-time psychiatric examination and

evaluation by Dr. Figueroa in connection with his disability claim. (Tr. 537-547). He


reported that he continued to struggle with depression since the death of his two sons in June of 2002 and that he had difficulty sleeping, irritability, and an inability to stay on task. (Tr. 537). Mental status examination revealed that although Plaintiff had a depressed mood, he exhibited the following normal behaviors: clear, goal-oriented speech; organized thoughts; no evidence of paranoia or delusions; no auditory or visual hallucinations; no suicidal or homicidal ideation; cognitive awareness of date, year, month, and current events, including the names of the current and past presidents; in-tact judgment, insight, and concentration.  (Tr. 539).  Dr. Figueroa diagnosed Major Depressive Disorder, recurrent, moderate, with a GAF of 49. (Tr. 539). He noted that Plaintiff's hepatitis C itself makes him tired all the time and drains his motivation, and that the symptoms of that disorder overlap those of his depression. (Id.). Dr. Figueroa doubted that Plaintiff would be able to sustain substantial gainful activity. (Id.).

Dr. Figueroa completed a Psychological/Psychiatric Impairment Questionnaire on the basis of his examination findings. (Tr. 540-547). He found Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods; to complete a normal workweek without psychiatric interruptions; to perform at a consistent pace without rest periods of unreasonable length and frequency; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 543-45). He also endorsed moderate limitations in almost every area relating to understanding and memory, concentration and persistence, social interaction, and adaptation. (Id.).

8.  Drs. Steward/Clements - Independent Examining Psychologists

On October 11, 2005, Plaintiff underwent independent psychological evaluation by Drs. Jason Steward and Rosimeri Clements in connection with his disability claim. (Tr. 666-670). He reported his history of depression since the time of the murder of his two sons, worsened by ongoing physical health concerns. (Tr. 666). At the time, his symptoms

included loss of sleep, periods of crying about his health and generally feeling overwhelmed, low motivation, feelings of worthlessness, and passive suicidal ideation. (Id.). Mental status examination revealed sporadic eye contact, a flat affect with some evidence of acute mental distress, a sad and withdrawn mood, and crying on discussing his sons and his ongoing back pain. (Tr. 668-69).  It also revealed that Plaintiff was "alert and well oriented with no symptoms of psychosis, such as hallucinations, delusions, or ideas of reference;" had no suicidal or homicidal tendencies; had good recall of recent and remote events; had logical and coherent thought process and articulation.  (Tr. 669).

Dr. Steward also administered the MMPI-2 personality assessment to Plaintiff, which included two validity scales, which suggested that his answers were candid and honest and that the resulting profile was valid. (Tr. 669). The test was consistent with someone "making a cry for help," with evidence of depression, somatic concerns, difficulties with interpersonal relationships, and general dissatisfaction. (Id.). Drs. Steward and Clements diagnosed Major Depressive Disorder, single episode, severe, without psychotic features; and polysubstance dependence, with full remission. (Tr. 670). They assessed his GAF at 50. (Id.). They found his ability to understand, remember, and carry out instructions were not affected by his impairments, but that his ability to respond appropriately to supervisors, co-workers, and work pressures were "slightly" affected, with his ability to respond appropriately to changes in the work setting being "moderately" affected. (Tr. 673).

9.  Dr. Ramon O. Martinez - Independent Examining Psychiatrist

On April 4, 2006, Plaintiff underwent another independent psychiatric evaluation performed by Dr. Ramon O. Martinez. (Tr. 727-36).  Plaintiff reported his history of drug abuse in remission, depression, and hepatitis, complicated by the fact that he was avoiding antidepressants due to their potential for adverse liver effects, and he hadn't treated his

hepatitis C with interferon therapy due to its tendency to cause depression. (Tr. 735).

Mental status examination revealed depression with a constricted mood congruent with his

thought processes, feelings of hopelessness and helplessness, negativistic thinking

regarding his physical condition, average fund of knowledge and intelligence, and fair

impulse control. (Tr. 736).  The examination also revealed that Plaintiff was not in "acute

distress," and that despite being depressed, he "denie[d] suicidal or homicidal ideations . . .

auditory or visual hallucinations . . . paranoia, delusions, or any psychotic thinking."  (Id.).

Dr. Martinez noted that "[c]ognitively [Plaintiff was] alert and oriented to time, place, and

person.  [His] memory is good for recent, remote and intermediate events  . . . [and that h]is

impulse control is fair."  (Id.).

Dr. Martinez diagnosed Major Depressive Disorder, severe, with a GAF of 50. (Id.).

He found Plaintiff "has been unable to function in the work setting since 2000" and that said

that with or without treatment, he doubted Plaintiff could be "reintegrated into the workforce

in the immediate future." (Id.). In a more detailed assessment form regarding Plaintiff's

mental functional capacity, Dr. Martinez endorsed marked limitations in eight areas of

mental function. (Tr. 730-33). Dr. Martinez stated that the limitations applied no earlier than

March of 2004. (Tr. 730-33).

## II.  The ALJ's Decision

When determining whether an individual is disabled, the ALJ must follow the five-

step sequential evaluation process established by the Commissioner and set forth in 20

C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  Specifically, the ALJ must determine whether

the plaintiff (1) is currently employed; (2) has a severe impairment; (3) has an impairment

or combination of impairments that meets or medically equals an impairment listed at 20

C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains

the ability to perform any work in the national economy.  See Phillips v. Barnhart, 357 F.3d

1232, 1237-1240 (11th Cir. 2004).  The plaintiff bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

Here, the ALJ found Plaintiff last met the insured requirements of the Act on June 30, 2002 and that he must prove his disability arose on or before that date. (Tr. 872).  The ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date of June 2, 2002. (Tr. 872).  At step two, the ALJ found Plaintiff suffered from severe asthma and hepatitis C, substance abuse disorder and depression.[12]  (Tr. 872).  At step three, he found Plaintiff's substance abuse disorder and "depressive syndrome" met the criteria of the Listings at sections 12.04 and 12.09, but that, if Plaintiff stopped his substance abuse, then Plaintiff's remaining impairments would not meet the criteria of a Listing.  (Tr. 872-73).  Assuming a cessation of the substance abuse, the ALJ concluded that Plaintiff would have retained the functional capacity for light work, lessened by the inability to perform postural activities more than occasionally, no excessive or concentrated exposure to airborne irritants, and which entailed no more than simple, repetitive tasks. (Tr. 874).

In making these findings, the ALJ gave "significant weight" to the testimony of Dr. Lewis, who felt that without substance abuse, Plaintiff would have been capable of simple, repetitive work prior to June 30, 2002. (Tr. 878).  The ALJ considered but ultimately declined to give great weight to the VA determination of disability, noting that "a different standard was applied" by that agency, "particularly regarding the effect of substance abuse

_____

[12] Although the ALJ did not overtly state that Plaintiff's substance abuse disorder or depression were severe impairments at step two, he expressly considered them at steps three, four, and five of the disability analysis (Tr. 872-881), and therefore, I have treated them as having been considered and credited as severe impairments at step two. Plaintiff does take issue, however, with the degree of the mental limitations the ALJ and Appeals Council ultimately found, at steps four and five, flow from Plaintiff's depression: i.e., that it only imposes a limitation to simple, repetitive work.

and the claimant's date last insured." (Tr. 878).  The ALJ also rejected examining psychiatrist Figueroa's mental function assessment because Dr. Figueroa only examined Plaintiff on one occasion, is not a treating source, and did not render an opinion until March of 2004, which the doctor did not relate back to the insured period. (Tr. 879).  Instead, the ALJ deferred to Dr. Lewis' interpretation of Dr. Figueroa's examination, which Dr. Lewis viewed as generally normal and at odds with the GAF of 45 which Dr. Figueroa had assigned.  The ALJ also deferred to Dr. Lewis' testimony that Plaintiff's back pain could have contributed to Dr. Figueroa's diagnosis of depression with a GAF of 45, noting that any exacerbation of Plaintiff's depression by back pain would not have affected his mental status during his insured period, as Plaintiff did not suffer the back injury until October, 2002. (Tr. 878).

The ALJ rejected Dr. R. Martinez' assessment from April of 2006, on the grounds that it was based solely on Plaintiff's reported history and not a review of his medical records relevant to his insured period, and because Dr. Martinez' opinions failed to address the role of drug abuse or noncompliance with prescribed treatment. (Tr. 879). The ALJ likewise rejected treating psychiatrist Lopez' opinions, finding them unsupported by his treatment notes, that classifying Plaintiff's depression as "moderate" was inconsistent with a GAF of 50 or below, and because Dr. Lopez' opinions are not based on "the objective medical evidence." (Tr. 879).  At step five, the ALJ found Plaintiff capable of performing the alternative unskilled, light jobs of warehouse checker, small products assembler, and mail sorter, citing the testimony of VE Capps. (Tr. 880-81).

On August 13, 2011, after expressly assuming jurisdiction, the Appeals Council issued its own unfavorable decision. (Tr. 849-865). The Council "agree[d] with" and "adopt[ed]" the findings of the ALJ. (Tr. 853), with certain additional findings based on the arguments raised by Plaintiff's representative in his letter dated March 17, 2011. (Tr. 859-

61). Specifically, the Council acknowledged but ultimately rejected the representative's arguments regarding the ALJ's rejection of the opinions of Drs. Lopez, Martinez, and Figueroa; his granting of controlling weight to the opinion of a non-examining medical advisor; and his refusal to find Plaintiff's subjective complaints credible. (Tr. 859-61).

The Council also analyzed but rejected the VA determination of total disability (Tr. 860). The Council ultimately found Plaintiff's hepatitis C, asthma, substance abuse, and mood disorder are legally severe impairments at step two; that in the absence of substance abuse, Plaintiff did not have an impairment that would meet or equal the criteria of a Listing; that Plaintiff retained the ability to perform light work entailing no more than occasional postural activities, no climbing, no concentrated or excessive exposure to airborne irritants, and no more than simple, repetitive tasks; that Plaintiff's functional capacity precluded his ability to perform any of his past relevant work; but that, adopting the step five findings of the ALJ, there were "a significant number of jobs in the national economy which he could have performed" (Tr. 853, 859). Also using Grid rule 202.21 "as a framework," the Council held that Plaintiff was not disabled at any time from his alleged onset date through his date last insured. (Tr. 859, 862).

### III. Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla but less than a preponderance. It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  The district court "may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]"  Id.  "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision."  Foote, 67 F.3d 1533, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

## IV. Discussion

### A.  Opinion of Treating Psychiatrist, Dr. Lopez

Plaintiff argues that the ALJ and Appeals Council[13] improperly rejected the medical opinions of treating psychiatrist, Dr. Lopez.  (Doc. 19 at 23).  Dr. Lopez began treating Plaintiff in September of 2006.  The ALJ concluded that the doctor's medical assessments were not relevant to the severity of Plaintiff's condition in June 2002.  Plaintiff concedes that Dr. Lopez "did not expressly state that his assessments applied retroactively to June 2002," but, Plaintiff argues that the doctor did record that the source of Plaintiff's symptoms was the June 2, 2002 death of his two sons.  (Doc. 19 at 24).

Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the sequential evaluation process. Absent good cause, the opinions of treating physicians must be accorded substantial or

---

[13] Plaintiff has taken issue with the findings of both the ALJ and the Appeals Council, generally, but he does not make a separate argument that the Appeals Council applied the incorrect legal standard to his case.  While Plaintiff submitted arguments to the Appeals Council, Plaintiff did not submit new evidence.  (Tr. 852-862).

considerable weight.  Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988). Good cause

exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2)

evidence supported a contrary finding; or (3) treating physician's opinion was conclusory[14]

or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1240-41

(citations omitted); see also Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir.1991).

Here, the ALJ declined to give Dr. Lopez' opinions significant weight primarily

because the psychiatrist did not indicate that the limitations she checked on the checklist

related back to Plaintiff's condition in June of 2002.  (Tr. 879).  The Appeals Council

affirmed the ALJ's finding and added that Dr. Lopez failed to attribute Plaintiff's condition to

the death of his sons.  (Doc. 859).

I find that the ALJ's decision to reject Dr. Lopez' testimony is supported by

substantial evidence.  First, Dr. Lopez' assessments, in large part, do not explain the

severity of Plaintiff's symptoms or their impact on his ability to perform substantial gainful

activity. Second, there is nothing in any of Dr. Lopez' treatment records to indicate that her

findings were intended to (or even capable of) being retroactively applied to June 2002.

For the most part, Dr. Lopez did not assess the degree of Plaintiff's mental

limitations, if any, or his ability to perform substantial gainful activity.  At times, the doctor's

reports are internally inconsistent.  For instance, in August 2007, she diagnosed Plaintiff

with Major Depressive Disorder with a GAF score of 50 but she also noted that he was

cooperative and maintained good eye contact; his affect was appropriate; his mood was

more anxious than depressed; despite thinking pessimistically, his thought process was

logical and he was goal-oriented; his insight was adequate and his judgment and impulse

---

[14] Where a treating physician simply makes conclusory statements, the ALJ may
afford them such weight as is supported by clinical or laboratory findings and other
consistent evidence of a claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075
(11th Cir. 1986).

control were intact; his memory for recent and remote events was intact and he had no suicidal or homicidal ideations.  (Tr. 1009-10; see also 1024-1025, 1039-1040).  Dr. Lopez mentioned nothing about whether Plaintiff had a limitation severe enough that it would preclude him from working.

It was not until March 6, 2009 that Dr. Lopez completed a Psychiatric/Psychological Impairment Questionnaire and gave any opinion on the severity of Plaintiff's condition.  (Tr. 1042-49); see Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of  . . . impairments does not reveal the extent to which they limit [Plaintiff's] ability to work or undermine the ALJ's determination in that regard.").  In 2009, Dr. Lopez found Plaintiff "moderately limited" in 17 of 20 listed areas of mental function attendant to the performance of substantial gainful activity. (Tr. 1045-47).  She noted that he "still has depressive symptoms and [is] also actively grieving [the] loss of loved ones." (Tr. 1047).  Dr. Lopez estimated Plaintiff would miss work more than three times a month due to his impairments. (Tr. 1049).  However, when asked the earliest date her assessment of Plaintiff's symptoms and limitations applied, she said "12 months," which would be March 2008, since she signed the checklist on March 6, 2009.  (Tr. 1049).

This Court cannot go back and extrapolate from Dr. Lopez' treatment notes something that is not there.  There is nothing in any of the doctor's treatment notes to relate her assessment back to Plaintiff's condition in June 2002.  Therefore, I respectfully recommend the district court reject Plaintiff's argument and affirm the Commissioner's decision in this regard.

B.  Opinion of Examining Psychiatrists Figueroa and Martinez

1.  Dr. Figueroa

Plaintiff argues that the ALJ and Appeal's Council's rejection of examining psychiatrist, Dr. Figueroa's one-time psychiatric examination of Plaintiff is "based on

improper inferences and inaccurate characterization of the record." (Doc. 19 at 20).

Plaintiff acknowledges that Dr. Figueroa's March 29, 2004 report is the "mental functional

capacity assessment that was rendered closest in time to the relevant period of June of

2002[.]" (Id.).  The term "closest" is relative, as Dr. Figueroa's assessment was made more

than a year and a half after Plaintiff's date last insured.

Dr. Figueroa's mental status examination demonstrated that although Plaintiff had a

depressed mood, he exhibited the following behaviors: clear, goal-oriented speech;

organized thoughts; no evidence of paranoia or delusions; no auditory or visual

hallucinations; no suicidal or homicidal ideation; cognitive awareness of date, year, month,

and current events, including the names of the current and past presidents; in-tact

judgment, insight, and concentration.  (Tr. 539).  Dr. Figueroa completed a

Psychological/Psychiatric Impairment Questionnaire on the basis of his examination

findings. (Tr. 540-547).

He found Plaintiff was markedly limited in his ability to maintain attention and

concentration for extended periods; to complete a normal workweek without psychiatric

interruptions; to perform at a consistent pace without rest periods of unreasonable length

and frequency; and to get along with co-workers or peers without distracting them or

exhibiting behavioral extremes. (Tr. 543-45).  The doctor also endorsed moderate

limitations in almost every area relating to understanding and memory, concentration and

persistence, social interaction, and adaptation. (Id.).  Plaintiff argues that Dr. Figueroa's

findings demonstrate "initial motor and speech retardation, a depressed mood, and a

dysphoric affect, all against a backdrop of reports of insomnia, irritability, and significantly,

a persistent struggle with depression since the death of his two sons in June of 2002."

(Doc. 19 at 21).

The ALJ's determination that Dr. Figueroa's assessment was internally inconsistent was merely part of his analysis - not the reason why he chose to reject the medical opinion. To the contrary, the ALJ said he "gives little weight to Dr. Figueroa's opinion that the claimant is unable to sustain gainful activity as it was rendered in March of 2004 and does not appear to relate to the insured status period prior to June 30, 2002.  This was a one-time examining consultation which appears to be a current evaluation of the claimant's mental health as of March of 2004."  (Tr. 879).

I find nothing in the record which contradicts the ALJ's finding.  There is nothing in the doctor's treatment notes to relate his assessment back to Plaintiff's condition in June 2002.  Therefore, the ALJ's decision to reject Dr. Figueroa's assessment because of its temporal irrelevance is based on substantial evidence and I respectfully recommend the district court affirm the Commissioner's decision in this regard.

2.  Dr. R. Martinez

Plaintiff argues that the ALJ and Appeal's Council's rejection of examining psychiatrist, Dr. R. Martinez' one-time psychiatric examination of Plaintiff is "based on improper inferences and inaccurate characterization."  (Doc. 19 at 20).  Dr. Martinez' mental status examination revealed that Plaintiff was depressed and that he had feelings of hopelessness and helplessness, as well as negativistic thinking regarding his physical condition.  (Tr. 736).  But, the assessment also revealed Plaintiff was not in "acute distress," and that despite being depressed, he "denie[d] suicidal or homicidal ideations . . . auditory or visual hallucinations . . . paranoia, delusions, or any psychotic thinking."  (Id.).  Dr. Martinez noted that "[c]ognitively [Plaintiff was] alert and oriented to time, place, and person.  [His] memory is good for recent, remote and intermediate events  . . . [and that h]is impulse control is fair."  (Id.).

Dr. Martinez diagnosed Major Depressive Disorder, severe, with a GAF of 50. (Id.).

He found Plaintiff "has been unable to function in the work setting since 2000" and that with

or without treatment, he doubted Plaintiff could be "reintegrated into the workforce in the

immediate future." (Id.). In a more detailed assessment of Plaintiff's capacity, Dr. Martinez

endorsed marked limitations in eight areas of mental function. (Tr. 730-33).

The ALJ stated that Dr. Martinez' opinion did not discuss the impact of Plaintiff's

substance abuse on his disability or his failure to comply with treatment. (Tr. 879).

Nevertheless, this was not the reason the ALJ discredited Dr. Martinez' medical opinion.

The ALJ explained that:

> Little weight has been given to Dr. Martinez' opinion that the
> claimant has been unable to function in a work environment
> since 2000. This examination was a one-time consultation
> performed in April of 2006. There is no evidence that Dr.
> Martinez had access to records or other objective medical
> evidence from June of 2002 or even 2000 upon which he based
> his opinion.

(Id.).

I find that the ALJ's decision to reject Dr. Martinez' opinion was appropriate because

(1) it was an opinion rendered on an issue reserved to the ALJ, and (2) the ALJ's findings

are supported by substantial evidence.

Dr. Martinez opined that Plaintiff had been "unable to function in a work setting since

2000." (Tr. 736). This assessment is not within the bounds of a permissible treatment

opinion. See 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from

physicians and psychologists or other medical sources that reflect judgments about the

nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and

prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical

or mental restrictions.") (emphasis added); Krauser v. Astrue, 638 F.3d 1324, 1332 (10th

Cir. 2011) ("[M]edical findings as to work-related limitations would, if accepted, impact the

ALJ's determination of RFC . . . but that does not make the medical findings an

impermissible opinion on RFC itself.  If doctors could only give opinions on matters that could not affect RFC, medical opinions would be inherently useless in disability determinations.").  On this record, I find that the ALJ appropriately rejected the doctor's statement.

Dr. Martinez' notes do not reveal what objective medical sources he consulted in gathering Plaintiff's historical profile, if any, or whether he based his assessment entirely off of Plaintiff's recitation.  Regardless, nothing in Dr. Martinez' treatment notes relate his assessment back to Plaintiff's condition in June 2002.  The assessment is not retroactive to the insured period and does not link Plaintiff's symptoms back to the insured period.  Dr. Martinez said the earliest date his assessment of Plaintiff's symptoms and limitations applied was March 2004.  (Tr. 733).  Accordingly, I respectfully recommend that the district court affirm the Commissioner's decision in this regard.

C.  <u>Reliance on Opinion of Medical Expert</u>

Plaintiff argues that the ALJ and Appeal's Council's erred by relying on Dr. Lewis' opinion which was unsupported by the record.  (Doc. 19 at 25).  Plaintiff's argument is two-fold.  He argues that the ALJ should not have credited Dr. Lewis' opinion concerning the treatment notes prepared by Dr. Lopez, Dr. Figueroa and Dr. R. Martinez.  (<u>Id.</u> at 26).  I find the ALJ's consideration of Dr. Lewis' opinion that these opinions were internally inconsistent does not justify reversal of the Commissioner's final decision.[15]  Substantial evidence (the results of the mental status examinations and the inability of the psychiatrists

---

[15] Plaintiff incorrectly asserts that the only rationale given by the ALJ and Appeals Council for discrediting these reports is that Dr. Lewis concluded the opinions were "not supported by information in their reports or elsewhere in the record." (Doc. 19 at 26).  As explained in sections IV.A and IV.B, <u>supra</u>, the ALJ's main reason for rejecting the medical opinions was that they did not relate back to Plaintiff's condition in June 2002.

to retroactively apply their assessments to June 2002) provides an independent basis upon which the ALJ could base his determination.[16]

Plaintiff also argues that Dr. Lewis disregarded record evidence when he opined that "the only medical evidence of record that 'pointed at' the period prior to the expiration of [Plaintiff's] insured status was a treatment note dated August 23, 2002, which reflected a working diagnosis of depression that was 'inconclusive.'" (Id.). With the exception of the August 2002 treatment record, all of the medical records cited by Plaintiff are dated after June 30, 2002. (Id. at 27). Plaintiff contends that all of the post-June 2002 treatment records provide evidence that he had difficulty dealing with the June 2, 2002 death of his two sons, which was "supportive of the depression diagnosis." (Id. at 27-28).

The ALJ is not concerned with a simple diagnosis of depression; the relevant inquiry is the *degree* to which a claimant's condition limits his ability to engage in substantial gainful activity. See Moore, 405 F.3d at 1213 n. 6 ("[T]he mere existence of . . . impairments does not reveal the extent to which they limit [a claimant's] ability to work or undermine the ALJ's determination in that regard."); see also Johns v. Bowen, 821 F.2d 551, 555 (11th Cir. 1987) (The Court rejected the testimony of the examining physician because it "omit[ted] any discussion of why the disability makes it impossible for the claimant to be gainfully employed, or the nature or permanence of the disability."); 20 C.F.R. § 404.1545(a) (The "residual functional capacity is the most you can still do despite your limitations."); Ward v. Astrue, No. 3:00-cv-1137-J-HTS, 2008 WL 1994978, at *3 (M.D. Fla. May 8, 2008) ("[A] 'mere diagnosis . . . says nothing about the severity of the condition . . . [D]isability determinations turn on the functional consequences, not the causes, of a claimant's condition'") (internal citations omitted).

---

[16] A treating physician opinion can be discredited if it "was not bolstered by the evidence." Lamb, 847 F.2d at 703.

The record does not establish that on or before June 30, 2002, Plaintiff was depressed or otherwise impaired to such a degree that he was unable to work.  The ALJ's decision is based on substantial evidence and is not undermined by the record.  Accordingly, I respectfully recommend that the district Court affirm the Commissioner's decision in this regard.

    D.  <u>Reliance on VE Testimony that Failed to Clarify his Sources</u>

Plaintiff argues that the ALJ and Appeals Council erred by relying on VE Capps testimony because it "fail[ed] to clarify the source of the numbers of jobs he cited."  (Doc. at 29).  In the Eleventh Circuit, when the expertise of the VE is not in dispute, the ALJ may rely on the VE's testimony simply "for her knowledge or expertise."  <u>Curcio v. Comm'r of Soc. Sec.</u>, 386 F. App'x 924, 926 (11th Cir. 2010) (citing 20 C.F.R. §§ 404.1560(b)(2), 404.1566(e), 416.960(b)(2), 416.966(e); <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony. Thus, no additional foundation is required.")); <u>Bryant v. Comm'r of Soc. Sec.</u>, 451 F. App'x 838, 839 (11th Cir. 2012) ("The Social Security regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE produce detailed reports or statistics in support of her testimony.").  The VE's expertise is not in dispute here.  Accordingly, I find Plaintiff's argument unpersuasive and respectfully recommend that the district court affirm the Commissioner's final decision in this regard.

## V.  Recommendation

Upon consideration of the foregoing, I respectfully recommend that the Commissioner's final decision in this case be **affirmed**; and that  the Clerk of Court be directed to enter judgment for the Commissioner pursuant to Sentence 4 of § 405(g) and close the file.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on February 11, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

      Presiding United States District Judge
      Counsel of Record